# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 9, 2007 Session

## LARRY JOHNSON v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26613      James C. Beasley, Jr., Judge**

---

**No. W2006-00345-CCA-R3-PC  - Filed July 24, 2007**

---

The petitioner, Larry Johnson, appeals the post-conviction court's denial of his petition for post-conviction relief. On appeal, he argues that he received the ineffective assistance of counsel because his attorney failed to request an instruction on second-degree murder as a lesser-included offense of premeditated first-degree murder and did not raise the trial court's failure to give such instruction as an issue in the motion for new trial. Following our review of the record and the parties' briefs, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which DAVID G. HAYES and NORMA MCGEE OGLE, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Larry Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scot Bearup, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### BACKGROUND

The defendant was convicted by a jury of the premeditated first-degree murder of Kelvert Hailey and was sentenced to life imprisonment with the possibility of parole.[1] This court affirmed his conviction on direct appeal, and the Tennessee Supreme Court denied permission to appeal. *See State v. Johnie Jefferson and Larry Johnson*, Nos. W1999-00747-CCA-R3-CD, W2000-01970-CCA-R3-CO, 2001 WL 1218287 (Tenn. Crim. App., at Jackson, Oct. 12, 2001),

---

[1] The defendant was convicted along with Johnie Jefferson. Mr. Jefferson's case is not part of this appeal.

*perm. app. denied* (Tenn. Mar. 11, 2002). The facts of the underlying conviction were recited by this court on direct appeal as follows:

Raniko Lindsey Bonner testified that in November 1997, she was living with her children and Marlo Richardson at Hurt Village Apartments. Bonner testified that at the time, she knew a man that she referred to as "MacLarry," whom she identified in court as Larry Johnson. Bonner testified that she was also associated with a man that she referred to as "J-Rock," whom she identified in court as Johnie Jefferson. According to Bonner, both men were members of a gang called the Gangster's Disciples. At that time, Bonner testified that she was dating a man named Tony Phillips (a.k.a."T-Money"). According to Bonner, Phillips was the leader of the Gangster's Disciples, although Bonner claimed she did not know that at the time of the offense.

Bonner testified that on November 3, 1997, she was at home with her mother, Phillips, Jefferson, Richardson, and Richardson's boyfriend, Dushack. Bonner testified that there were knocks at her front and back doors. Bonner opened the back door and saw Larry Johnson and Marcus Glass (a.k.a.["]Sporty"). Bonner then opened the front door to find Robert Walker. Bonner testified that Walker gave her some alcohol and asked her to fix him a sandwich. After Bonner gave Walker the sandwich, Glass called Jefferson away from the table where he was sitting. Jefferson went to the back of the apartment and spoke to Johnson and Glass.

Bonner testified that after the conversation, she asked Johnson to take her to her aunt's house. Johnson said that he couldn't because "he had some business to take care of." Bonner went upstairs to straighten up her room, and when she came back, Jefferson, Johnson and Glass had all gone.

Bonner testified that she saw Johnson the next night when he and Glass returned to Bonner's apartment. Bonner testified that the Defendants told her that "one of the folks was found dead in the park." Bonner testified that "folks" refers to members of the Gangster's Disciples.

Marcus Rydell Glass (a.k.a.["]Sporty") testified that he was charged in this case with facilitation of the murder in the first degree of Kelvert Hailey, the victim in this case. Glass testified that he had been a member of the Gangster's Disciples since 1989. Glass testified that there is an organizational structure to the gang in which he stated that he held the position of "chief of security." According to Glass, there are certain rules in the gang, and those members that do not follow the rules are punished. As "chief of security" for the city, Glass worked under Tony Phillips, who is the "overseer." Robert Walker, Johnie Jefferson and Larry Johnson were also "chief [s] of security." One of the duties of a "chief of security" is "handling violations."

Glass testified that he knew the victim as a member of the Gangster's Disciples but did not know if the victim held a position within the organization. According to Glass, the victim had violated one of the rules of the Gangster's Disciples. Glass testified that on November 3, 1997, Larry Johnson called him and asked him to come to the home of Johnson's girlfriend. Johnson told Glass that the victim was there. At some point after Glass arrived, the victim left. Glass and Johnson left and found the victim near where Johnson's car had been parked. The victim asked if he could get a ride to a club called Ebony Lace. According to Glass, the victim did not know that he was in trouble.

Johnson, Glass and the victim left the apartment complex and went to Burger King. At the restaurant, Johnson approached Glass and told him that "instead of dropping [the victim] off we're going to go get a bag of weed so we can smoke it." The three men then went to an apartment complex called Hurt Village. Once there, Glass and Johnson went into an apartment that belonged to Tony Phillips' girlfriend, Raniko Bonner (a.k.a.["]Nikki"). Jefferson, Phillips, and Walker (a.k.a.["]McRob") were all there. Jefferson and Walker told Phillips that the victim was in the car. Glass testified that he was carrying a .380 Smith and Wesson gun; that Johnson was carrying a .357 Smith and Wesson revolver; and that Jefferson was carrying a nine-millimeter Smith and Wesson gun. According to Glass, all of the guns were provided by Tony Phillips.

Johnson, Jefferson and Glass left the apartment. While standing outside, Johnson explained to Jefferson that he had "set[ ] . . . [the victim] up" by telling the victim that they were going to get some marijuana. The three men then got in Johnson's car along with the victim. With Johnson driving, the men went to Levi Road in Whitehaven. When asked why they went to Levi Road, Glass testified that he guessed it was "to kill [the victim]." Johnson parked the car on the side of Levi Road. Jefferson then got out of the car and said that he had to urinate; however, he instead opened the back door and pulled the victim out of the car at gunpoint. Glass testified that the victim told him to tell them that he was begging for his life. Johnson tried to help Jefferson pull the victim out of the car, and at that point, the victim tried to run.

Glass testified that when the victim started to run, Johnson shot him twice in the back. The victim tried to run to the left into the woods, but he fell. Jefferson took the gun from Johnson and shot the victim four times while he was lying on the ground. Jefferson then got his own gun and shot the victim twice more. Jefferson and Johnson got back in the car, and Jefferson said that the victim was "broke." Glass remained in the car during the incident. Glass testified that he was in trouble with the organization for not participating in the murder.

Glass testified that he went to Tony Phillips' house the next day to give him back his gun. Phillips wanted the guns back so that he could "drill them out." According to Glass, Phillips wanted to drill the grooves out of the gun to change its ballistics. Johnson and Jefferson were both at Phillips' house, having the same thing done to their guns. Glass identified in court the guns used to kill the victim as the ones that Jefferson and Johnson used on November 3, 1997.

After the murder, Glass left town and went to Chicago. When Glass called his mother, she told him that the Fugitive Squad was looking for him. Glass called Phillips. According to Glass, Phillips told him "what he was going to do to [Glass]" if he went to the authorities. After a week in Chicago, Glass went back to Memphis where he again talked to Phillips. Glass testified that Phillips threatened him and his family.

Robert Walker testified that he was raised in Detroit and that while there, he became a member of the Black Gangster's Disciples. Walker testified that the Black Gangster's Disciples was different from the Gangster's Disciples in Memphis. When Walker moved to Memphis in 1996, he joined the Gangster's Disciples. Walker testified that he eventually held the position of "chief security" of the city and reported directly to the "overseer," Tony Phillips. Walker testified that Jefferson and Johnson were also "chief[s] of security."

Walker, with the aid of a chart, testified regarding the organizational structure of the Gangster's Disciples. According to Walker, Phillips was the "overseer" of the organization in Memphis. Jefferson was a "chief of security" in charge of enforcement, and Johnson and Glass were Jefferson's two assistants. Walker testified that he was also a "chief of security" in charge of growth and development. Walker explained that as part of his job within the organization, he investigated and punished violations. Walker testified that he and Jefferson frequently met at Phillip's residence to discuss gang business.

Regarding Jefferson's position as an "enforcer," Walker testified that if Phillips "tell[s] him to go out there and kill somebody, he'll do it." According to Walker, there are some violations within the organization that necessarily result in death. One of those violations is "1919," which is when a gang member gives a statement to police. Walker said that he was aware that the victim was in trouble with the organization because he had broken "1919."

Walker testified that on November 3, 1997, he, Phillips, Jefferson, and Richardson were all at the home of Raniko Bonner, Walker's sister. Johnson and Glass arrived later in Johnson's car. Walker testified that Johnson was carrying a .357 revolver and Glass was carrying a ".380." Walker testified that Johnson talked to Phillips and told him that they had the victim in the car. According to Walker, Phillips told Jefferson to "take care of his business" and winked his right eye.

-4-

Walker testified that the winking of the right eye signified that Jefferson was supposed to "put [the victim] to sleep." Jefferson then left with Glass and Johnson. Walker testified that he walked outside with them, and Johnson told him that "he was fixing to go kill dude."

Marlo Richardson (a.k.a. "Loony Toon") testified that she talked to Marcus Glass after the death of the victim and that Glass told her that "he didn't mean it to happen that way." According to Richardson, Glass said that he shot the victim. Richardson testified that he lived with Raniko Bonner at Hurt Village Apartments. Richardson testified that she remembered the day that Phillips, Walker, Jefferson, and Glass were all at Bonner's apartment. Richardson testified that Johnson was not there. Richardson testified that Glass, Jefferson, and Walker all left. Although Richardson testified at trial that Johnson was not at Bonner's place on November 4, 1997, she admitted in her statement that Phillips, Walker, Johnson, Glass and Jefferson were all there, and she recalled that they were discussing that someone had been killed.

Alvin Odom testified that on November 4, 1997, he was riding in a car with his wife. The couple had just dropped off their children at elementary school and were traveling on Levi Road taking their daughter to day care. While on Levi Road Odom saw a man, later identified as the victim, Kelvert Hailey, lying in a ditch. He first thought that the man had just passed out and asked his wife if they should try to wake him up. His wife agreed, and they turned the car around and headed back towards where they had seen the man. After they pulled up beside the man, Odom began to get out of his car when his wife started "shaking and crying." She said that she saw holes in the man's head. The Odoms immediately went back to the elementary school where they had dropped off their children and told a teacher what they had seen. The teacher then called the police, and the Odoms returned to where they had found the body and waited for the police.

Byron Braxton of the Memphis Police Department responded to the call and arrived on the scene around 7:25 a.m. or 7:30 a.m. Braxton spoke to the Odoms and observed the crime scene. According to Braxton, the victim was "a male black wearing white tennis shoes, green jeans and a red and white jacket, laying in a semi fetal position, face down in a ditch on the north side of Levi." Braxton said that he observed a large hole in the back of the victim's head. Braxton testified that the area in which the victim was found was "relatively secluded," with no houses in the immediate vicinity and only a couple of businesses nearby. In addition to the body, Braxton observed two handgun shell casings near the body. Braxton also noticed "a scuff or some type of skid mark in the dirt, in line with the body in the ditch." A tooth was also found at the crime scene.

Officer Danny James, a member of the Crime Scene Unit of the Memphis Police Department, testified that he collected evidence at the crime scene. James testified that the victim's shoe print was on the pavement near the ditch where he was found. According to James, there were "little burs [sic] on [the victim's] lower pants and shoes and socks," which he believed someone would get if they walked or ran through weeds. Officer James took photographs of the victim's body, including a photograph of the victim's hand, which was clinched in a fist. Officer James testified that he did not find any physical evidence such as fingerprints, hair, or clothing fibers that belonged to the Defendants. Officer Shan Allen Tracy of the Memphis Police Department testified that a bullet was found in the dirt underneath where the victim's head had been.

Sergeant R.D. Roleson of the Memphis Police Department testified that he was assigned to locate the witnesses in this case. Larry Johnson was one of the individuals whom Roleson was assigned to locate. After talking to a witness named Melissa Looney at the homicide office, Sergeant Roleson requested that Looney call Larry Johnson's beeper. The number from which Johnson returned the call was traced, and the police then went to that location. A consent to search form for the house was obtained, but Johnson was not there. While there, Sergeant Roleson learned that Johnson's car was in the parking lot. Roleson testified that he had the car towed to the crime scene building to be processed. Roleson testified that he had the car towed because based on his investigation, it was likely that the victim was last seen in Johnson's vehicle.

A warrant was later obtained to search Johnson's vehicle. The warrant was based on the affidavit of Sergeant O.W. Stewart of the Memphis Police Department. The affidavit states, in pertinent part:

> [A]ffiant has received information relating to the shooting death of Kelvert Hailey from a reliable witness who advised that Larry Johnson and Marcus Glass were responsible for the death of Kelvert Hailey. This witness did see Marcus Glass armed with a black automatic handgun on Thursday, November 6, 1997 two days after the body was recovered on Tuesday, November 4, 1997 at 7:32 a.m. This reliable witness gave information that on Friday, October 31, 1997 this witness saw Larry Johnson in possession of a chrome revolver. The victim had been shot six times in the back and head and only two spent casings from a 9mm automatic were found on the scene of the Homicide, indicating that another weapon was involved. This witness also indicated that Marcus Glass and Larry Johnson were together on Monday night, November 3, 1997, until the early morning hours of Tuesday, November 4, 1997, were occupying Larry

-6-

Johnson's 1984 Buick Lasabre, VI N# 1G4AN69Y8EX422903 and were with the victim just prior to the victim's death.

Officer Barry G. Lane of the Memphis Police Department, a member of the Crime Scene Unit, processed Larry Johnson's car. A revolver was found in its case in the trunk of the car. Lane also confiscated six live rounds from the car and a pawn shop ticket "in regards to the nine-millimeter pistol." Officer Lane obtained fingerprints from a photograph that was found in the vehicle. He also obtained fingerprints from the rearview mirror and a cologne bottle found inside. James Hill, a latent print examiner with the Memphis Police Department, testified that the fingerprints on the rearview mirror belonged to Larry Johnson and that the fingerprints on the photograph belonged to Tony Phillips.

Ronnie McWilliams testified that he worked as an investigator on the anti-gang team in the Attorney General's office. McWilliams testified that on October 6, 1997, he interviewed the victim regarding a robbery investigation. McWilliams talked to the victim "to gain knowledge of gangs in his area and what he knew about it." McWilliams testified that the victim indicated that he was a member of the Gangster's Disciples, but he did not discuss the structure of the organization. McWilliams also testified that he participated in the execution of an Federal Bureau of Investigation (F.B.I.) search warrant on Tony Phillip's residence. McWilliams testified that he found a drill and drill bits in the residence.

Robert Daniel Royce, a forensic scientist specializing in firearms identification with the Tennessee Bureau of Investigation (T.B.I.), testified that the bullet found in the ground beneath the victim's head matched the nine millimeter pistol that was entered into evidence. Royce also testified that the interior of the Smith and Wesson .357 Magnum revolver had been drilled out. Royce testified that he believed two weapons were used to kill the victim: a .357 revolver and nine millimeter pistol.

Defendant Jefferson testified that he was twenty-two years old and lived with his parents. Jefferson testified that he did not know about the victim's death until he was arrested on November 5, 1997. Jefferson stated that he had never seen or heard of the victim before November 5, 1997. When questioned about where he was on the day of the murder, Jefferson testified that he did not know. Jefferson also testified that he did not know Larry Johnson and had never heard of him before November 5, 1997.

Jefferson testified that he had been a member of the Gangster's Disciples since 1994, when he was seventeen years old. Jefferson testified that he did not hold a position within the organization. Jefferson testified that in 1995 he was charged with robbery and gave a statement against his co-defendant, also a member of the

-7-

Gangster's Disciples. According to Jefferson, Glass contacted Jefferson and told him that "since [he] gave a statement, at that time [he] was told to take that charge for the robbery and let the co-defendant loose." Jefferson testified that he did not believe he had a choice and that he had to take the charge. Jefferson testified that when he made it known in 1995 that he wanted out of the organization, Glass told him that he had to "suffer the consequences." Jefferson testified that the consequences were death or being put into a situation to "get caught up." Jefferson testified that he did not know what positions Glass and Phillips held in the Gangster's Disciples, but he knew they "ranked high."

Defendant Larry Johnson testified that he played the organ at Al Green's church in Memphis. Johnson testified that he often visited his cousin Ira Farris, who lived with Tony Phillips and Totti Brown. Johnson testified that Phillips also cut his hair sometimes. Johnson testified that he did not know that Phillips was a member of the Gangster's Disciples. Johnson testified that met Marcus Glass at Phillips' residence. Johnson stated that he sometimes transported Glass to the Hurt Village apartment complex because both of their girlfriends lived there. Johnson testified that he also did not know that Glass was a member of the Gangster's Disciples.

Johnson testified that he met Robert Walker for the first time at the preliminary hearing. Johnson testified that he had met Raniko Bonner when he took Phillips to her apartment. Johnson further testified that he did not know Jefferson before he was arrested, and he maintained that he had only met the victim once. Johnson testified that he did not go to Bonner's apartment during the day on November 3, 1997, but he admitted that he did go there that night.

Johnson testified that on November 4, 1997, he saw Glass walking, so he gave him a ride. Glass asked if he could put a bag in the trunk. Johnson said that he eventually dropped Glass off at Kingsgate Apartments. Johnson testified that his car was having some problems, so on November 4, 1997, he took the car to Phillips' apartment complex because Phillips and Farris knew some mechanics that would work inexpensively.

When Johnson returned to work on Saturday, the car still was not fixed. The mechanic told Johnson that he needed a wrench, so Johnson testified that he looked in his trunk to find one. When Johnson looked in the trunk, he saw that Glass' bag was still there. Johnson testified that he went through the bag and found a gun. Johnson testified that he went inside and told Phillips that Glass left a gun in his car. According to Johnson, Phillips told him that he couldn't bring the gun inside, so Johnson put the gun back in the trunk of his car.

Johnson testified that he was driving his car on the night of November 3, 1997. Johnson testified that he was with his brother on the night of the murder;

however, his brother failed to testify as to Johnson's whereabouts on that night. Johnson testified that he was at Phillips' residence when the police beeped him. Johnson stated that nobody answered when he called the number on his beeper. Johnson recalled that after attempting to return the call, he left.

Totti Brown, Tony Phillips' roommate at the time of the offense, testified that Johnson and Jefferson frequently came to her apartment to see Phillips. Brown testified that on November 9, 1997, she was at home with Phillips and Johnson. At some point during the day Johnson received a page. Brown recalled that Johnson called the number on the pager, but nobody answered. According to Brown, Johnson then told Phillips that he was going to leave because "he didn't know what was going on." Brown testified that Phillips left about thirty minutes later. Soon thereafter, the Memphis Police Department arrived looking for Johnson.

Debra Falasco testified that she works for the Title Division of the Shelby County Clerk's Office. As part of her job, Falasco is custodian of vehicle ownership records in Shelby County. Falasco testified that on October 21, 1997, Larry Johnson applied for a title on a blue 1984 Buick LeSabre. The license plate number in her records matched the one on Larry Johnson's car.

Dr. Wendy Gunther, Medical Examiner for Shelby County, performed the autopsy on the victim. Dr. Gunther testified that the cause of death was gunshot wounds to the victim's head, neck, and torso. Dr. Gunther testified that probably six or seven bullets went through the victim's body. According to Dr. Gunther, two bullets went through the victim's head.

*Id.* at *1-7.

On July 14, 2002, the petitioner filed a pro se petition for post-conviction relief, and following the appointment of counsel, an amended petition was filed. An evidentiary hearing was conducted on September 2, 2005. The petitioner's trial counsel testified at the hearing that the petitioner's first-degree murder trial took place in May 1999. Counsel acknowledged that he did not request any lesser-included offense jury instructions and no such instructions were given by the trial court. Counsel admitted that the trial court asked both parties if there was a reason it should charge something less than premeditated murder and counsel did not give a reason. Counsel acknowledged that at the time of the petitioner's trial, second-degree murder was a lesser-included offense of premeditated first-degree murder. Counsel explained that he did not request a second-degree murder instruction because it was inconsistent with the theory of defense – the defendant said he was not there, and there was no proof that would support a second-degree murder charge.

Counsel acknowledged the concept that trial strategy should not preclude the jury from considering guilt of a lesser offense included in the crime charged. Counsel could not recall whether he was aware of the Tennessee Supreme Court's pronouncement in *State v. Burns* regarding lesser-

included offenses at the time he filed the petitioner's appellate brief on direct appeal on June 12, 2000. Counsel also could not recall whether, at that time, he was familiar with the concept that new state constitutional rules were given retroactive application to cases that were in the trial or appellate process when announced. Counsel maintained a second-degree murder instruction was not supported by the evidence at trial.

On cross-examination, Counsel stated that the petitioner claimed he did not know his co-defendant, Jefferson, until they met in jail, and he denied knowing that Glass and Phillips were gang members. Counsel noted that a gun was recovered from the petitioner's car, and he tried to have the gun suppressed but his motion was overruled. According to Counsel, the petitioner told him that the gun belonged to Glass who must have left it in the petitioner's car, and the petitioner denied having any knowledge of or involvement in the shooting. Counsel said that the petitioner gave him the names of possible alibi witnesses, but no one could provide an alibi. Counsel stated he was unable to get in touch with petitioner's brother, whom the petitioner claimed to be with at the time of the shooting. Counsel also stated that he worked with the co-defendant's counsel in coordinating the investigation and respective theories of defense. Again, Counsel said that he did not request a second-degree murder instruction because "[i]t was an all or nothing deal. [He wasn't] there. [He] didn't do it." On examination by the court, Counsel recalled that the co-defendant presented the same theory of defense as the petitioner.

The post-conviction court denied the petitioner's petition, determining that it was harmless beyond a reasonable doubt for the trial court to not instruct the jury on second-degree murder. The court noted that the evidence supporting premeditation was overwhelming and uncontroverted, and that "no jury could reach a verdict on any thing other than premeditated first degree murder based on the facts and the law presented in this case." The court determined that Counsel was not ineffective for not requesting the charge when there was no basis for giving such charge.

**STANDARD OF REVIEW**

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

**ANALYSIS**

To establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the

defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A fair assessment of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Strickland*, 466 U.S. at 697.

Initially, we note that the petitioner presents this issue in his brief as "whether trial counsel was ineffective for not requesting an instruction on second degree murder as a lesser included offense of premeditated first degree murder . . . ." At the time of the petitioner's trial, second-degree murder was a lesser-included offense of premeditated first-degree murder.[2] *See State v. Bolden*, 979 S.W.2d 587, 593 (Tenn. 1998). At that time, the court was required to "instruct the jury on all lesser offenses if the evidence introduced at trial [was] legally sufficient to support a conviction for the lesser offense." *Bolden*, 979 S.W.2d at 593; *see* Tenn. Code Ann. § 40-18-110(a) (1997). Our supreme court noted that "the trial court's obligation under this statute is mandatory, provided there is sufficient evidence for a rational trier of fact to find a defendant guilty of a lesser offense." *Bolden*, 979 S.W.2d at 593. Under this prior version of Tennessee Code Annotated section 40-18-110, a defendant did not have to request a lesser-included instruction to raise the trial court's failure to give such an instruction as an error on appeal. *See State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006).

Because the trial court had a mandatory duty to instruct the jury on lesser-included offenses regardless of a request to do so from the defendant, this court has previously concluded that defense counsel was not ineffective for failing to request an instruction on a particular lesser-included offense. *See Jerome Sawyer v. State*, No. W2005-01813-CCA-R3-PC, 2007 WL 778828, at *20 (Tenn. Crim. App., at Jackson, Mar. 15, 2007); *Chivous Robinson v. State*, No. E2005-01036-CCA-R3-PC, 2006 WL 1381511, at *6 (Tenn. Crim. App., at Knoxville, May, 19, 2006), *perm. app. denied* (Tenn. Oct. 2, 2006); *Jeffery Lee Miller v. State*, No. M2003-02841-CCA-R3-PC, 2005 WL 901130, at *5 (Tenn. Crim. App., at Nashville, Apr. 19, 2005), *perm. app. denied* (Tenn. Oct. 17, 2005). However, the petitioner asserts that the Tennessee Supreme Court in *Wiley v. State*, 183 S.W.3d 317 (Tenn. 2006), indicates that the trial court's duty to charge lesser-included offenses does

---

[2] Second-degree murder is still a lesser-included offense of premeditated murder under part (b) of the *Burns* test. *See State v. Burns*, 6 S.W.3d 453, 466-67 (Tenn. 1999).

not excuse an attorney from voicing an objection when the court neglects its duty. Even if the petitioner is correct in his interpretation of *Wiley*, in this collateral attack proceeding, the petitioner bears the burden of proving by clear and convincing evidence a reasonable possibility exists that the outcome would have been different had the instruction been given.

Again, to prove prejudice, the petitioner must show that there is a reasonable probability the outcome of the trial would have been different had the instruction been given. *See Strickland*, 466 U.S. at 694. The post-conviction court concluded that "no jury could reach a verdict on any thing other than premeditated first degree murder based on the facts and the law presented in this case." We agree, given the overwhelming evidence of premeditation presented at trial, we conclude the petitioner has failed to establish that he was prejudiced by Counsel's failure to request a second-degree murder instruction.

The petitioner also alleges that Counsel was ineffective in failing to raise the issue of lesser-included offense instructions in the motion for new trial because that failure effectively prevented him from receiving the retroactive benefit of *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), on direct appeal. In *Burns*, our supreme court stated that an offense is a lesser-included offense if:

> a) all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>>
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c) it consists of
>
>> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>>
>> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

*Id.* at 466-67. The court then outlined a two-step procedure for determining whether a lesser-included offense must be charged in a jury instruction:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

*Id.* at 469. The court went on to note that "[w]hether sufficient evidence supports a conviction of the charged offense does not affect the trial court's duty to instruct on the lesser offense if evidence also supports a finding of guilt on the lesser offense. The jury, not the judge, performs the function of fact-finder." *Id.* at 472. Accordingly, the petitioner asserts that had Counsel preserved the lesser-included offense issue and raised it on appeal, this court in retroactively applying *Burns* (which clearly indicated he was entitled to a second-degree murder instruction), would have reversed his conviction.[3]

Upon review, we conclude that the petitioner has failed to prove by clear and convincing evidence that he was prejudiced by Counsel's failure to preserve and raise the issue on appeal. To prevail on this claim, the petitioner needed to show that this court on direct appeal would have determined that the trial court's failing to instruct the jury on second-degree murder was reversible error. It follows that even if we had determined the trial court erred in failing to give the instruction, we would have concluded that the error was harmless. Thus, the petitioner has failed to prove he was prejudiced by Counsel's failure to preserve the lesser-included offense issue and raise it on appeal.

## CONCLUSION

Based on the aforementioned reasoning and authorities, we conclude that the petitioner has failed to prove his allegations by clear and convincing evidence. Thus, we affirm the denial of post-conviction relief.

---

[3] *Burns* applies retroactively to cases that were in the appellate pipeline or pending at the time the decision was announced. *See, e.g.*, *State v. Frederick Morrow*, No. M2005-00554-CCA-R3-PC, 2006 WL 1931698, at *11 (Tenn. Crim. App., at Nashville, July 11, 2006) (citing *State v. Stokes*, 24 S.W.3d 303 (Tenn. 2000)).

_____

J.C. McLIN, JUDGE